Bryan L. Bleichner (Bar No. 220340)
**CHESTNUT CAMBRONNE PA**
100 Washington Ave S, UNIT 1700
Minneapolis, Minnesota 55401
Tel: (612) 339-7300
bbleichner@chestnutcambronne.com

Tyler J. Bean (*pro hac vice to be filed*)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
tbean@sirillp.com

*Attorneys for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANSCISO DIVISION**

| | |
|---|---|
| LISA ROGERS, *on behalf of herself and all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> META PLATFORMS, INC., SAMASOURCE IMPACT SOURCING INC., d/b/a SAMA, and LUXOTTICA OF AMERICA, INC., <br><br> Defendants. | Case No.:   3:26-CV-2401 <br><br> CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL |

Plaintiff Lisa Rogers ("Plaintiff") brings this class action complaint ("Complaint") on behalf of herself and all others similarly situated ("Class Members") against Defendant Meta Platforms, Inc. ("Meta"), Defendant Samasource Impact Sourcing, Inc., d/b/a "Sama" ("Sama"), and Defendant Luxottica of America, Inc. ("Luxottica") (collectively, "Defendants") for the

privacy violations alleged herein. The allegations in this Complaint are based on Plaintiff's personal knowledge as to her own acts and experiences and on the investigation of counsel. As to all other matters, the allegations are made upon information and belief:

## NATURE OF THE CASE

1. This case exposes the ugly machinery behind a sleek product and underscores the reality that Meta will stop at nothing in its pursuit of ever-increasing profit and drive toward gaining an even stronger foothold in the tech industry via Artificial Intelligence ("AI") initiatives.

2. Meta continues to misrepresent its products and services, and its AI-enabled smart glasses, which are marketed under the Ray-Ban and Oakley brands (collectively, the "Meta AI Glasses" or "Glasses"), are the latest in a multi-decade pattern of bad conduct that, by design, invades the lives of ordinary citizens and bystanders

3. Meta designs, controls, and operates the AI software, the cloud infrastructure, and data pipelines that are embedded in the Glasses.

4. Sama is Meta's subcontractor who is responsible for the human review and annotation of the video, audio, and image data that is captured by the Meta AI Glasses.

5. Meta transmits footage captured through the Glasses—including highly intimate recordings of users in their homes, bedrooms, and bathrooms—to Sama's data annotation facilities in Nairobi, Kenya, where thousands of human workers manually view, label, and assess that footage to train Meta's artificial intelligence models.

6. Meta markets these AI Glasses as an "all-in-one assistant" that empowers its wearers to "remain in control of their privacy." However, the opposite is true.[1]

---

[1] Svenska Dagbladet, *Meta's AI Smart Glasses and Data Privacy Concerns: Workers Say "We See Everything"*, https://www.svd.se/a/K8nrV4/metas-ai-smart-glasses-and-data-privacy-concerns-workers-say-we-see-everything (last visited Mar. 13, 2026).

7.    When a user activates the AI Glasses by pressing a physical button or uttering the wake-up phrase "Hey Meta", the devise captures high-resolution video and audio and transmits that data through the user's smartphone to Meta's cloud servers and Sama's processing center.[2]

8.    From there, Meta routes selected footage into a data-annotation pipeline managed by Sama, where contractors in Nairobi sit in rows of cubicles drawing bounding boxes around objects, labeling images, checking transcriptions, and performing quality assurance, all while viewing, in full resolution, the most private moments of unsuspecting Americans' lives.

9.    The content that these workers see is alarming. Multiple Sama employees were interviewed by Swedish investigative journalists and described footage of people using bathrooms, undressing, engaging in sexual activity, and inadvertently exposing bank card details and other financial information.[3]

10.    One worker has recounted: "I saw a video where a man puts the glasses on the bedside table and leaves the room. Shortly afterwards his wife comes in and changes her clothes." Another worker stated: "We see everything—from living rooms to naked bodies. Meta has that type of content in its databases." A third worker described sex scenes filmed with the Glasses: "someone is wearing them having sex. That is why this is so extremely sensitive."[4]

11.    Plaintiff brings this Class Action on behalf of a Nationwide Class and seeks compensatory, statutory, and punitive damages, disgorgement, and injunctive and declaratory relief for Meta's violations of (1) the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510–2522; (2) Invasion of Privacy; and (3) Unjust Enrichment.

---

[2] Meta Platforms, Inc., *Supplemental Privacy Policy*, https://www.meta.com/br/en/legal/privacy-policy/ (last visited Mar. 13, 2026).
[3] *Svenska Dagbladet*, *Meta's AI Smart Glasses and Data Privacy Concerns*, supra note 1.
[4] *Id*.

CLASS ACTION COMPLAINT

**PARTIES**

*Plaintiff*

12.    Plaintiff is a citizen and resident of Pasadena, California, and has resided in California at all times relevant to this Complaint. On or around November 2, 2025, Plaintiff purchased two (2) Ray-Ban Meta Wayfarer glasses at Sunglass Hut for approximately $926.84.

13.    Plaintiff had purchased the Meta AI Glasses in reliance on Meta's nationwide and widespread marketing and advertising campaign, including explicit representations that the glasses were "designed for privacy," "controlled by you," and "built for your privacy and others too."

14.    Plaintiff has used the Meta AI Glasses' voice-activated AI assistant feature by speaking the wake phrase "Hey Meta" to ask questions, identify objects, and utilize other AI-powered features advertised by Meta.

15.    When Plaintiff used these AI features, the Meta AI Glasses captured video and audio of Plaintiff's surroundings and transmitted this content to Meta's servers in real time.

16.    On numerous occasions, Plaintiff has used the Meta AI Glasses while in her home, including in private spaces where she had a reasonable expectation of privacy.

17.    Plaintiff was not informed, and she did not consent to, Meta routing her captured video and audio footage to third-party human contractors employed by Sama in Nairobi, Kenya, for manual review, annotation, and use in training Meta's AI models.

18.    At the time of purchasing the AI Glasses, Plaintiff was not aware of any disclaimer or other explicit notice stating that Meta would use her private video and audio recordings without her permission.

19.    Plaintiff would not have purchased the AI Glasses, or would have paid substantially less for them, had she known that intimate and private video and audio captured in her home would be viewed by human workers.

20.    Plaintiff has experienced, and continues to experience, significant anxiety, stress, fear, and frustration as a result of the invasion of her privacy. This harm goes far beyond mere worry or inconvenience; it constitutes precisely the type of injury the law recognizes and seeks to remedy. As a result of Defendants' conduct, Plaintiff has suffered damages including, but not limited to, invasion of privacy, loss of the benefit of her bargain, and statutory damages as alleged herein.

*Defendants*

21.    Meta Platforms Inc. is a Delaware corporation with its principal place of business at 1 Meta Way, Menlo Park, California 94025. Meta designs, manufactures (in partnership with EssilorLuxottica S.A.), distributes, markets, and sells the Meta AI Glasses. Meta owns and operates the AI software, cloud infrastructure, data processing systems, and contractual relationship through which user-captured footage flows from the AI Glasses to Meta's servers and onward to its subcontractors. Meta controls the data pipeline at every stage: from the on-device wake-word detection system to the smartphone app that serves as the connectivity intermediary, to the cloud servers that receive and store the footage, to the annotation queues that route footage to human reviewers, to the AI models that consume the resulting labeled data. Meta generated over $200 billion in revenue in fiscal year 2025.[5]

---

[5] Finterra, *Meta's AI Transformation: Analyzing the Llama Integration and the $200 Billion Ad-Tech Engine*, Fin. Content, https://markets.financialcontent.com/lightport.lightport5/article/finterra-2026-1-27-metas-ai-transformation-analyzing-the-llama-integration-and-the-200-billion-ad-tech-engine (last visited Mar. 13, 2026).

CLASS ACTION COMPLAINT

22.    Defendant Samasource Impact Sourcing, Inc., d/b/a Sama, is a Delaware corporation with its principal offices at 2017 Mission Street, Suite 301, San Francisco, California 94110. Sama operates data annotation facilities on Mombasa Road in Nairobi, Kenya, where it employs thousands of data annotators who manually review, label, and annotate video, audio, and image data for Meta and other technology clients. Sama workers assigned to Meta's AI Glasses project review footage captured by the Glasses' cameras—including intimate footage of users and individuals in their vicinity—to train Meta's AI models. Sama operates under Meta's direction and control, executing annotation tasks according to Meta's specifications, within an intensely monitored work environment that bans personal smartphones and surveils the workforce with cameras.

23.    Defendant Luxottica of America, Inc. is an Ohio corporation with its principal place of business located at 4000 Luxottica Place, Mason, OH 45040-8114. On information and belief, Luxottica of America, Inc., in partnership with Meta, advertises, markets, and sells the Meta AI Glasses throughout the United States. The unfair, unlawful, deceptive, and misleading Challenged Representations and Omissions on the Products were prepared, authorized, ratified, and/or approved by Luxottica and its agents, and were disseminated throughout California and the nation by Luxottica and its agents to deceive and mislead consumers in the State of California and throughout the United States into purchasing the Meta AI Glasses.

## FACTUAL ALLEGATIONS

**A.  Meta's Business Operations and Artificial Intelligence Platform**

24.    Meta produces the Meta AI Glasses in partnership with EssilorLuxottica S.A., the French Italian eyewear conglomerate that owns the Ray-Ban and Oakley brands. The current

product lineup includes: the Ray-Ban Meta (first and second generation), the Oakley Meta HSTN, the Oakley Meta Vanguard, and the Meta Ray-Ban Display.[6]

25.     The Glasses are powered by a Qualcomm Snapdragon AR1 Gen1 system-on-chip and feature integrated 12-megapixel cameras capable of capturing both still photographs and high-definition video, a multi-microphone array for voice capture and ambient audio recording, open ear speakers, and Bluetooth and Wi-Fi connectivity for data transmission.

26.     The Glasses operate in two recording modes. First, users can manually capture photos and video by pressing a physical button on the right temple of the frame. Second, users can activate Meta's AI assistant by speaking the wake phrase "Hey Meta," which triggers the Glasses to begin recording audio and, in many modes, video, and to transmit that data to Meta's cloud servers for AI processing.

27.     Meta markets the Glasses as a revolutionary personal assistant. At Meta Connect in September 2025, CEO Mark Zuckerberg personally demonstrated the Glasses, preaching that they would serve as an "all-in-one assistant" offering live translation, visual recognition, travel guidance, and real-time information. Meta touts the Glasses as a device that lets users "remain in control of their privacy."[7]

28.     The representation is false. As described herein, Meta designed the Glasses to capture intimate audiovisual data, transmit it to remote servers, and route it to overseas contractors for human review, while burying the scope of this data collection across a thicket of fragmented, misleading, and contradictory privacy policies.

---

[6] David Heaney, *Meta & EssilorLuxottica Sold 7 Million Smart Glasses in 2025*, UploadVR (Feb. 11, 2026), https://www.uploadvr.com/meta-essilorluxottica-sold-7-million-smart-glasses-in-2025/ (last visited Mar. 13, 2026).
[7] *Svenska Dagbladet*, *Meta's AI Smart Glasses and Data Privacy Concerns*, supra note 1

29. The Glasses have achieved explosive commercial success. EssilorLuxottica reported in its Q4 2025 earnings that it sold over seven million AI-enabled smart glasses in 2025 alone—more than tripling the two million units sold in 2023 and 2024 combined. Based on EssilorLuxottica's reported North American revenue share of approximately 46%, an estimated 3.2 million of these units were sold in the United States. The companies are now discussing plans to increase annual production capacity to 20–30 million units. [8]

30. Meta's AI Glasses are not an isolated product—they are a central pillar of Meta's corporate transformation from a social media platform into an AI infrastructure company. Meta has staked its future into artificial intelligence, and the Glasses are the hardware vehicle through which Meta intends to embed its AI into the physical world.

31. Meta spent approximately $38–40 billion on capital expenditures in 2024 and raised its 2025 capital expenditure outlook to $64–72 billion, directed primarily at AI infrastructure, including data centers, GPU clusters, and model training.[9] Meta projects capital expenditures nearing $100 billion in 2026.[10]

---

[8] Samantha Subin, *Ray-Ban Maker EssilorLuxottica Triples Sales of Meta AI Glasses*, CNBC (Feb. 11, 2026), https://www.cnbc.com/2026/02/11/ray-ban-maker-essilorluxottica-triples-sales-of-meta-ai-glasses.html.

[9] Larry Dignan, *Meta Ups Its 2025 Spending on AI, Data Centers*, Constellation Research (Apr. 30, 2025), https://www.constellationr.com/insights/news/meta-ups-its-2025-spending-ai-data-centers (last visited Mar. 13, 2026).

[10] FinTerra, *Meta's AI Transformation: Analyzing the Llama Integration and the $200 Billion Ad-Tech Engine* (Jan. 27, 2026), https://markets.financialcontent.com/lightport.lightport5/article/finterra-2026-1-27-metas-ai-transformation-analyzing-the-llama-integration-and-the-200-billion-ad-tech-engine (last visited Mar. 13, 2026).

CLASS ACTION COMPLAINT

32.     Meta's AI strategy centers on its proprietary Llama series of large language models ("LLMs"). Meta released Llama 2 in 2023, Llama 3 in 2024, and Llama 4 in early 2025.[11] Llama 4 provides the backbone for Meta AI, the AI assistant integrated into WhatsApp, Instagram, and critically, the Meta AI Glasses. Meta AI reached over one billion monthly active users.[12]

33.     The AI Glasses are uniquely important to Meta's strategy because they are the only Meta product that captures real-world audiovisual data from the physical environment. Unlike Facebook or Instagram, which receive data that users voluntarily upload—the Glasses passively capture the world around the wearer: their home, their family, their conversations, their most private moments. This captured data is the raw material Meta needs to train its multimodal AI models to understand and interpret the physical world. On the Q2 2025 earnings call, Zuckerberg stated: "I think AI glasses are [going to] be the main way that we integrate superintelligence into our day-to-day lives."[13]

34.     Meta has constructed an AI ecosystem in which the Glasses are the sensory input, the Llama models are the processing engine, and Meta's advertising platform, which reached a $60 billion annual run rate through its AI-driven Advantage+ system in 2025, is the monetization output. The data captured from users through the Glasses feeds directly into this monetization

---

[11] Yahoo Finance, *Why Meta Platforms' Open-Source AI Strategy Might Win the Long Game* (Oct. 17, 2025), https://finance.yahoo.com/news/why-meta-platforms-open-source-080000414.html (last visited Mar. 16, 2026).

[12] Thomas Germain, *Meta's New Privacy Policy Opens Up AI Chats for Targeted Ads*, Gizmodo (Jan. 1, 2026), https://gizmodo.com/meta-new-privacy-policy-opens-ai-chats-for-targeted-ads-2000555583 (last visited Mar. 16, 2026).

[13] Daniele Lepido & Antonio Vanuzzo, *Meta Said to Discuss Doubling Ray-Ban Glasses Output After Surge in Demand*, Bloomberg (Jan. 13, 2026), https://www.bloomberg.com/news/articles/2026-01-13/meta-said-to-discuss-doubling-ray-banglasses-output-after-surge-in-demand (last visited Mar. 13, 2026).

CLASS ACTION COMPLAINT

model: better training data produces smarter models, smarter models produce better ad targeting, and better ad targeting produces more revenue. [14]

35.    Meta's entire AI architecture depends on a continuous supply of real-world audiovisual training data—data that is extracted from millions of users under a framework designed to maximize collection while minimizing transparency.

**B. Meta's Glasses Intercept, Record, Transmit, and Disclose Highly Sensitive Data Without Users' or Bystanders' Knowledge or Consent**

36.    When a user activates the AI function on the Meta AI Glasses, whether by pressing the capture button or speaking "Hey Meta," the Glasses capture audio and video data and transmit it via Bluetooth (or Wi-Fi when available) to the user's paired smartphone running the Meta AI app. The smartphone performs intermediate processing (including HDR rendering and image stabilization) and then transmits the data to Meta's cloud servers.

37.    Meta operates approximately 24 data center campuses globally, with at least 18 operational facilities in the United States, and additional facilities in the EU. Testing by Swedish investigative journalists confirmed consistent data transmissions from the Glasses to Meta servers during normal operation.

38.    When users ask Meta AI questions about what they see, the Glasses transmit data to Meta's cloud for AI processing, which is then used to improve Meta products and train its AI.

39.    However, Meta does not disclose which cloud infrastructure receives this data, where data reviewers are located, or that its data reviewers are actually underpaid data annotators employed by a commercial subcontractor on another continent, 7,000 miles away.

---

[14] FinTerra, *Analyzing the Llama Integration and the $200 Billion Ad-Tech Engine*, supra note 10.

CLASS ACTION COMPLAINT

40.    From Meta's servers, selected footage enters a data annotation pipeline managed by Sama in Nairobi, Kenya. The onward transfer of user data from Meta's U.S. servers to Sama's Nairobi annotation queues is the legally operative data flow for the claims alleged herein—a cross-border transfer confirmed by contractor testimony and the Swedish investigation.

41.    On February 27, 2026, Swedish newspapers Svenska Dagbladet and GöteborgsPosten published a joint investigation, titled "Your Eyes, Their Data" (Swedish: Dina ögon, deras data), based on interviews with more than thirty employees at different levels of Sama's Nairobi operations. The investigation was conducted in collaboration with Naipanoi Lepapa, an award winning investigative freelance journalist based in Nairobi.

42.    The reporters met Sama workers at a hotel in Nairobi, at a safe distance from Sama's offices on Mombasa Road. Some workers arrived straight from night shifts; others were preparing for ten-hour shifts. All spoke on condition of anonymity because they had signed extensive confidentiality agreements and feared termination—and with it, a return to poverty.

43.    The workers described what they see on their screens every day. Multiple Sama employees working specifically on annotating videos, images, and speech for Meta's AI systems reported seeing footage of:

- Bathroom Visits: People using toilets and bathing, captured by the Meta AI Glasses left in bathrooms or worn by household members.

- Nudity: Individuals undressing, captured unknowingly – for example, a man placed his glasses on the bedside table, and the still recording AI Glasses captured his wife entering the room and changing clothes

- Sexual Content: Sex scenes filmed by users wearing the AI Glasses during intercourse

11
CLASS ACTION COMPLAINT

- Financial Information: Bank cards, credit cards, and other sensitive financial documents visible on screen, and

- Private Conversations: Text transcriptions of "any topics at all", including discussions of crimes, protests, and sexually explicit descriptions of other people.[15]

44.    One worker stated "In some videos you can see someone going to the toilet or getting undressed. I don't think they know, because if they knew they wouldn't be recording."[16]

45.    Another worker said that "We see everything—from living rooms to naked bodies. Meta has that type of content in its databases. People can record themselves in the wrong way and not even know what they are recording. They are real people like you and me." A third described the footage as capable of triggering "enormous scandals" if leaked.[17]

46.    One worker described the psychological burden: "When you see these videos, it feels that way [like looking into someone's private life]. But since it is a job, you have to do it. You understand that it is someone's private life you are looking at, but at the same time you are just expected to carry out the work. You are not supposed to question it. If you start asking questions, you are gone."[18]

47.    Meta's purported safeguard for this pipeline, an automatic face blurring algorithm does not reliably function. A former Meta employee explicitly acknowledged this failure, stating "The algorithms sometimes miss. Especially in difficult lighting conditions, certain faces and bodies become visible." [19]

---

[15] Victoria Lepapa et al., *She Came Out of the Bathroom Naked*, Svenska Dagbladet (Feb. 27, 2026), https://www.svd.se/a/K8nrV4/metas-ai-smart-glasses-and-data-privacy-concerns-workers-say-we-see-everything (last visited Mar. 17, 2026).
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

48. The journalists also purchased their own pair of Meta AI Glasses and tested them. They found that: (a) the AI functions cannot operate solely through local, on-device processing—an internet connection is required; (b) network traffic analysis showed frequent and consistent data transmissions to Meta servers; and (c) the claim made by retail sales staff that "nothing is shared" with Meta and that "everything stays locally in the app" is demonstrably false.[20]

49. Meta was given two months to respond to the journalists' questions about how the company informs users about the Glasses, what filters prevent private material from reaching annotators, how the chain of subcontractors is audited, and why footage showing extremely private situations reaches annotation queues. After two months, Meta's spokesperson in London, Joyce Omope, responded with a letter that did not directly answer any of the questions, instead referring to the journalists to Meta's AI terms of use and privacy policy.[21]

50. When asked to explain how sharing highly private material with subcontractors in Kenya can be reconciled with its privacy policy, Meta and Sama did not respond. [22]

51. Meta's refusal to address these specific questions, despite extended lead time, underscores that consumers were never provided clear, direct notice of human review of intimate content.

**C. Class Members Did Not Consent to Meta's Conduct**

      **i.  Meta's Conduct Exceeds Any Purported Consent, and Its Privacy Policies Are Fragmented and Inadequate**

52. Meta's privacy disclosure framework for the AI Glasses is spread across no fewer than four separate documents: (1) the Supplemental Meta Platforms Technologies Privacy Policy;

---

[20] *Id.*
[21] *Id.*
[22] *Id.*

(2) the Meta AI Terms of Service; (3) the Meta Voice Controls Privacy Notice, and (4) the Supplemental Meta Platforms Technologies Terms of Service. Each document cross-references the others, creating a labyrinth of disclosures that no reasonable consumer would read in full, let alone synthesize into a coherent understanding of how their data is actually used.

53. This fragmentation is not accidental; it is by design. The critical disclosures about human review are buried in subsections nominally about voice recording storage, separated from the default-on disclosures about transcript storage. A user who reads only the primary privacy policy—which is itself lengthy and densely cross-referenced—would not learn that "trained reviewers" means underpaid data annotators employed by a commercial subcontractor in Nairobi, Kenya. Meta never defines "trained reviewers" in any of its policies.

54. Simply put Meta does not specify what "third parties" means, does not name Sama, and it does not describe human review of intimate video footage.

55. All this information is and was highly relevant and sensitive to Plaintiff and Class Members when they decided to purchase and use the Glasses.

56. At no point in any of Meta's privacy documents does Meta disclose: (a) that intimate video footage—including nudity, sexual activity, and bathroom visits—is reviewed by human annotators; (b) that those annotators are employed by Sama, a commercial data-labeling subcontractor; (c) that the annotation takes place in Nairobi, Kenya; (d) that Meta's face anonymization algorithm frequently fails, leaving faces and bodies visible to reviewers; or (e) that footage captured during false or accidental activations of the "Hey Meta" wake word also enters the annotation pipeline

57. No reasonable consumer reading Meta's privacy policies—individually or collectively—would understand that wearing the Glasses in their home could result in footage of

14
CLASS ACTION COMPLAINT

their spouse undressing, their child bathing, or their private conversations being transmitted to a warehouse in Kenya and viewed by strangers.

### ii.    Meta's Framework Fails to Provide a Reasonable Opt-Out

58.    On April 29, 2025, Meta fundamentally restructured the default privacy settings for the AI Glasses. Prior to that date, users could choose whether to enable Meta AI with camera functionality and could toggle voice recording storage on or off. After April 29, 2025, Meta enabled Meta AI with camera functionality by default on all Glasses. Meta simultaneously removed the option for users to opt out of voice recording storage entirely.[23]

59.    Following the April 2025 change, voice recordings and transcripts are stored by default and may be retained for up to one year. The only mechanism now available to users who wish to avoid retention is to manually delete each individual recording from the app. Unintended activations ("false wakes") are supposed to be deleted within 90 days, but even that reduced period means Meta retains recordings of conversations the user never intended to initiate.

60.    Meta communicated the April 2025 changes through a generic email to existing users that described the update as a routine privacy policy update. Meta did not use the words "optout removed," "setting discontinued," or "you must now manually delete" in this email notice.

61.    As such, any continued use does not constitute acceptance or consent given that Meta's unilateral amendment lacks adequate notice of material changes. [24]

---

[23] Amanda Silberling, *If You Own Ray-Ban Meta Glasses, You Should Double-Check Your Privacy Settings*, TechCrunch (Apr. 30, 2025), https://techcrunch.com/2025/04/30/if-you-own-ray-ban-meta-glasses-you-should-double-check-your-privacy-settings/ (last visited Mar. 13, 2026).

[24] *See Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171 (9th Cir. 2014).

CLASS ACTION COMPLAINT

62.     For video data captured during Live AI sessions, Users have no way to know how long Meta retains video of their homes, their families, and their most private moments—or when, if ever, that data is deleted.

### D.  Technical Framework

#### i.     Data Flows Directly from the AI Glasses to Sama's Annotation Queues

63.     The Meta AI Glasses operate on a four-stage data architecture. The Glasses contain an on-device microcontroller for wake-word detection (the "Hey Meta" trigger) and a Qualcomm Snapdragon AR1 Gen1 system-on-chip for audio/video capture. When "Hey Meta" is detected—or the capacitive capture button is pressed, the device begins recording and transmitting data. The audio and video data are transmitted via Bluetooth (or Wi-Fi when available) to the paired smartphone running the Meta AI app and Meta's cloud infrastructure. The data on Meta's servers enters the data annotation pipeline managed by Sama in Nairobi, Kenya. Sama workers manually review the footage: drawing bounding boxes around objects, assigning labels, checking transcriptions, and performing quality assurance. The labeled data is then used to train and refine Meta's AI models.

64.     A single "Hey Meta" invocation in a user's living room results in: (a) on-device audio and video capture; (b) wireless transmission to the paired smartphone and Meta's cloud servers; and (c) potential routing of the footage to a human annotator in Kenya who views, labels, and annotates the content. At no stage does the user receive real-time notice that their footage may be viewed by a human being.

65.     The "Hey Meta" wake-word detection system is imprecise, and Meta's policies define voice interactions to include accidental activations and background sound during interactions.

66.     The imprecision of the wake-word system means that the Glasses may begin recording at any time in response to ambient speech—capturing conversations the user never intended to record and never knew were being transmitted to Meta's servers.

### ii.     Statutory Framework

67.     The Electronic Communications Privacy Act, 18 U.S.C. §§ 2510–2522, prohibits the intentional interception, disclosure, and use of wire, oral, or electronic communications. 18 U.S.C. § 2511(1). The statute provides a private right of action under 18 U.S.C. § 2520, with statutory damages of the greater of $100 per day for each day of violation or $10,000, plus actual damages, profits made by the violator, punitive damages, and reasonable attorneys' fees. 18 U.S.C. § 2520(c)(2).

68.     Although the ECPA contains a one-party consent exception—permitting interception where one party to the communication has consented—that exception does not apply "where such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). This is known as the "crime-tort exception".

69.     Recent decisions in this District have held that plaintiffs similar to Plaintiff here adequately alleged invasion of privacy sufficient to trigger the ECPA crime-tort exception.

70.     Meta's conduct satisfies the crime-tort exception. Meta intercepts users' private communications—including audio, video, and text transmitted through the Glasses to its servers and onward to Sama—for the purpose of committing the independent tort of intrusion upon seclusion. Meta's purpose in intercepting this data is to train its AI models, which Meta accomplishes by routing intimate footage of private moments to human annotators in Kenya. The routing of video showing nudity, sexual activity, bathroom visits, and financial information to

CLASS ACTION COMPLAINT

overseas contractors for manual viewing—without adequate notice or consent—constitutes an intentional intrusion upon the solitude and seclusion of Plaintiff and Class Members that would be highly offensive to any reasonable person. Because Meta's interception of these communications is undertaken for the purpose of this tortious conduct, the one-party consent exception is inapplicable, and Meta's ECPA liability attaches.

## CLASS ACTION ALLEGATIONS

71.     Plaintiff brings this action on behalf of herself, and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), and seeks certification of the following Class:

> **Nationwide Class**: All persons residing in the United States who, during the Class Period, used Meta AI Glasses and whose audio, video, or electronic communications were intercepted, recorded, transmitted, stored, or disclosed by Meta and/or Sama.[25]

72.     Excluded from the Class are: (a) Defendants and any entity in which either has a controlling interest; (b) the current and former officers, directors, and employees of Defendants; (c) the judges and court staff assigned to this matter; and (d) counsel for all parties.

73.     *Numerosity*: The Class is so numerous that joinder of all members is impracticable. EssilorLuxottica reported sales of over seven million AI-enabled smart glasses in 2025 alone, with an estimated 3.2 million units sold in the United States. The precise size of the Class is currently unknown to Plaintiff but is readily ascertainable through Meta's own records, which track

---

[25] Plaintiff's understanding of Meta's conduct is ongoing and still evolving. Accordingly, the "Class Period" is the earliest date permitted by law through the present.

registered device owners and their geographic locations. Each Class consists of well over a million individuals.[26]

74.    ***Predominant Common Questions***: The Class claims present several questions of law and fact common to all members that predominate over any questions affecting individual Class Members, including:

(a) Whether Meta intercepted, recorded, transmitted, stored, or disclosed Class Members' communications through the Meta AI Glasses;

(b) Whether Meta's interception of Class Members' communications was undertaken for the purpose of committing a criminal or tortious act within the meaning of 18 U.S.C. § 2511(2)(d);

(c) Whether Meta's conduct constitutes intrusion upon seclusion;

(d) Whether Meta's privacy policies provided adequate notice of, or obtained valid consent for, the human review of Class Members' footage by Sama contractors;

(e) Whether Meta violated the ECPA, 18 U.S.C. §§ 2510–2522;

(f) Whether Meta was unjustly enriched by its interception and use of Class Members' communications; and

(g) Whether Plaintiff and Class Members are entitled to damages, including statutory, compensatory, and punitive damages, disgorgement, and injunctive relief.

75.    ***Typicality***: Plaintiff's claims are typical of all Class Members because they arise from the same course of conduct by Defendants and are based on the same legal theories. Plaintiff

---

[26] Samantha Subin, *Ray-Ban Maker EssilorLuxottica Triples Sales of Meta AI Glasses*, CNBC (Feb. 11, 2026), https://www.cnbc.com/2026/02/11/ray-ban-maker-essilorluxottica-triples-sales-of-meta-ai-glasses.html (last visited Mar. 6, 2026).

used the Meta AI Glasses, and Plaintiff's communications were intercepted, transmitted, stored, and disclosed to Sama in the same manner as all Class Members.

76. *Adequate Representation*: Plaintiff will fairly and adequately represent the Class and protect the interests of all Class Members. Plaintiff has retained competent counsel with significant experience in class action and data privacy litigation. Plaintiff and counsel have no interests that conflict with the interests of the Class and are not subject to any unique defenses. Plaintiff and counsel will vigorously prosecute this action to advance the interests of the Class and have the resources necessary to do so.

77. *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all Class Members is impracticable. Individual litigation would impose an unreasonable burden on the courts and on the parties, would create a risk of inconsistent or contradictory judgments, and would be inefficient given that the claims arise from uniform conduct directed at millions of consumers. Class-wide adjudication provides comprehensive oversight by a single court and avoids duplicative proceedings.

78. Plaintiff reserves all rights to revise or modify the class allegations based on facts and legal developments following additional investigation or discovery.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510–2522**
**On Behalf of Plaintiff and the Nationwide Class**

79. Plaintiff restates and realleges all the allegations stated above and hereafter as if fully set forth herein.

80. The ECPA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any wire, oral, or electronic communication. 18 U.S.C. § 2511(1)(a).

81. The ECPA further prohibits any person from intentionally disclosing or endeavoring to disclose to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of such a communication in violation of the Act. 18 U.S.C. § 2511(1)(c).

82. The ECPA further prohibits any person from intentionally using, or endeavoring to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of such a communication in violation of the Act. 18 U.S.C. § 2511(1)(d).

83. Meta intentionally intercepted Plaintiff's and Class Members' wire, oral, and electronic communications by capturing audio and video data through the Meta AI Glasses and transmitting that data to its cloud servers and onward to Sama's annotation facilities in Kenya—without adequate notice or consent.

84. Meta intentionally disclosed the contents of Plaintiff's and Class Members' intercepted communications by transmitting that footage to Sama, a third-party commercial subcontractor, for manual human review and annotation.

85. Meta intentionally used the contents of Plaintiff's and Class Members' intercepted communications to train and refine its AI models, enhance its products, and power its advertising platform.

86. Although 18 U.S.C. § 2511(2)(d) provides a consent exception where one party to the communication has consented, that exception is inapplicable here because Meta intercepted Plaintiff's and Class Members' communications "for the purpose of committing [a] criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

87.     Specifically, Meta intercepted Plaintiff's and Class Members' communications for the purpose of committing the tort of intrusion upon seclusion, as described in the Fourth Cause of Action below. Meta's interception and onward transmission of intimate footage—including nudity, sexual activity, bathroom visits, and private conversations—to overseas contractors for manual viewing constitutes an intentional intrusion upon the solitude and seclusion of Plaintiff and Class Members that is highly offensive to a reasonable person. Because Meta's purpose in intercepting these communications was to commit this independent tortious act, the one-party consent exception does not shield Meta from ECPA liability. *See Semien v. PubMatic Inc.*, No. 5:24-cv-05765 (N.D. Cal.); *Krzyzek v. OpenX Techs., Inc.*, No. 5:24-cv-06379 (N.D. Cal.)

88.     Meta's violations of the ECPA are ongoing and continuous. Each day that Meta intercepts, discloses, and uses Plaintiff's and Class Members' communications without lawful consent constitutes a separate violation of the statute.

89.     Pursuant to 18 U.S.C. § 2520, Plaintiff and the Nationwide Class are entitled to: (a) preliminary, equitable, and declaratory relief; (b) damages, including actual damages and any profits made by Meta as a result of its violations, or statutory damages of the greater of $100 per day for each day of violation or $10,000, whichever is greater; (c) punitive damages; and (d) reasonable attorneys' fees and litigation costs.

## SECOND CAUSE OF ACTION
### Intrusion Upon Seclusion
### On Behalf of Plaintiff and the Nationwide Class

90.     Plaintiff restates and realleges all of the allegations stated above and hereafter as if fully set forth herein.

91.     The Restatement (Second) of Torts § 652B provides that "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or

concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

92.    Meta intentionally intruded upon Plaintiff's and Class Members' solitude and seclusion by: (a) intercepting and recording their private audio and video communications through the Meta AI Glasses; (b) transmitting that footage—including recordings of nudity, sexual activity, bathroom visits, and private conversations—to its cloud servers; (c) routing that footage to Sama's annotation facilities in Nairobi, Kenya, where human workers manually viewed the recordings in full resolution; and (d) using the annotated data to train and refine Meta's AI models and enhance its advertising business.

93.    Plaintiff and Class Members had a reasonable expectation of privacy in their homes, bathrooms, bedrooms, and private conversations. The types of footage described herein—nudity, sexual activity, bathroom visits, bank card exposure, and intimate conversations—are among the most private categories of human experience.

94.    Meta's intrusion is highly offensive to a reasonable person. Recording a person undressing or using the bathroom in their own home, transmitting that footage across the internet to a server farm, and routing it to a warehouse in Kenya where strangers manually view, label, and annotate the content—all to train a commercial AI product—is conduct that shocks the conscience.

95.    Meta's intrusion is made more offensive by: (a) the vast scale of the surveillance, involving millions of users across the United States; (b) the intimacy of the footage, which captures people in their most vulnerable private moments; (c) Meta's active concealment of the scope and nature of the human review; (d) Meta's deliberate removal of opt-out mechanisms in April 2025; (e) the cross-border transfer of intimate footage to a third-party contractor in a country with no

EU-equivalent data protection adequacy determination; and (f) Meta's acknowledged failure to reliably anonymize the footage before human review.

96.     Meta's conduct caused Plaintiff and Class Members harm, including violation of their privacy interests, emotional distress, and loss of control over highly intimate personal information.

97.     Plaintiff and Class Members seek compensatory damages, disgorgement of profits, and punitive damages. Meta's conduct was willful, knowing, and carried out with conscious disregard for Plaintiff's and Class Members' rights.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**
**On Behalf of Plaintiff and the Nationwide Class**

98.     Plaintiff restates and realleges all of the allegations stated above and hereafter as if fully set forth herein.

99.     Meta received substantial benefits from Plaintiff and Class Members in the form of their private audio, video, and electronic communications. Meta acquired this data without adequate notice or consent and without providing corresponding compensation.

100.    Meta used this private data for its own commercial benefit, including: training and refining its Llama AI models; improving its Meta AI assistant; enhancing its advertising targeting capabilities through the AI-driven Advantage+ platform; and increasing the value of its products and services. Meta's AI Glasses data pipeline directly fed the monetization flywheel that generated over $200 billion in annual revenue in fiscal year 2025.

101.    Had Plaintiff and Class Members known the true scope of Meta's data practices— including that their most intimate moments would be viewed by human annotators in Kenya— they would not have purchased the Glasses or used the AI features, and they would not have agreed to Meta's collection and use of their data.

CLASS ACTION COMPLAINT

102.    Meta unjustly retained these benefits at the expense of Plaintiff and Class Members. It is inequitable under principles of unjust enrichment for Meta to retain the profits and other benefits derived from its unauthorized interception and exploitation of Plaintiff's and Class Members' private communications.

103.    Meta should be compelled to disgorge these profits and other inequitable proceeds in a common fund for the benefit of Plaintiff and Class Members.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class described above, respectfully requests that this Court enter an Order:

    a.  Certifying the Nationwide Class and appointing Plaintiff as Class Representative;

    b.  Appointing Plaintiff's Counsel as Class Counsel;

    c.  Finding Meta's conduct unlawful;

    d.  Awarding injunctive and declaratory relief, including an order permanently enjoining Meta from intercepting, recording, transmitting, storing, or disclosing Plaintiff's and Class Members' private communications without lawful consent, requiring Meta to delete all footage obtained in violation of law, and further requiring Meta to provide clear, conspicuous notice of any human review of AI Glasses recordings and meaningful mechanisms to disable or limit such review;

    e.  Awarding statutory damages under 18 U.S.C. § 2520 to Plaintiff and the Nationwide Class;

    f.  Awarding compensatory, actual, and nominal damages;

    g.  Awarding punitive damages;

CLASS ACTION COMPLAINT

h.  Awarding disgorgement of all profits and revenues Meta obtained through its unlawful conduct;

i.  Awarding pre and post judgment interest as provided by law;

j.  Awarding reasonable attorneys' fees, costs, and expenses; and

k.  Granting such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

DATED: March 19, 2026                     Respectfully submitted,

/s/ *Bryan Bleichner*

Bryan L. Bleichner (Bar No. 220340)
**CHESTNUT CAMBRONNE PA**
100 Washington Ave S, UNIT 1700
Minneapolis, Minnesota 55401
Tel: (612) 339-7300
E: bbleichner@chestnutcambronne.com

Tyler J. Bean
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com

*Attorneys for Plaintiff and the Putative Class*

.